**CENTER CADILLAC, INC., Center Cadillac Leasing, Inc., Irwin Steinhauser, Elaine Steinhauser, Michael Steinhauser, Marleen Steinhauser, Marilyn Steinhauser, Josh Steinhauser as Administrator of the Estate of Marvin Steinhauser, James Sandler, and Rosalyn Sandler, Plaintiffs,**

v.

**BANK LEUMI TRUST COMPANY OF NEW YORK, Martin A. Simon, Eliot Robinson, Leonard Levine, Eftihia Piper, Vincent Garvey and Rachel Bergsohn, Defendants.**

**No. 91 Civ. 7776 (CBM).**

United States District Court,
S.D. New York.

April 13, 1992.

Gold & Wachtel, Randy Steinhauser, New York City, for plaintiffs.

Parker Chapin Flattau & Klimpl, Stephen Rinehart, New York City, for defendants.

MOTLEY, District Judge.

This action was commenced in United States District Court for the District of New Jersey. The complaint alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, and pendant state law claims for fraud and breach of contract. Defendants moved to dismiss the complaint for failure to state a claim or, in the alternative, to transfer venue pursuant to 28 U.S.C. § 1404(a). Judge Nicholas H. Politan, United States District Judge, District of New Jersey, transferred the case to the Southern District of New York by order dated October 28, 1991. Defendants' motion to dismiss is now before the Court.

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court may not dismiss the complaint unless it appears beyond a doubt that Plaintiffs can prove no set of facts upon which relief may be granted. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). For purposes of this motion, the court accepts the facts alleged in the complaint as true.

STATEMENT OF FACTS

During the times relevant to the complaint, Plaintiffs Irwin Steinhauser, Michael Steinhauser, Marvin Steinhauser and James Sandler (collectively, the "Officers") were officers of Center Cadillac and Center Leasing, two corporations authorized to do business in the state of New York. Plaintiffs in this action, Center Cadillac, Center Leasing, the Officers,[1] and the Officers' spouses, brought suit against Defendants Bank Leumi Trust Company of New York ("Bank Leumi") and certain officers of Bank Leumi. Defendant Martin Simon was the Chief lending officer of Bank Leumi from 1979 to 1986. Defendants Eliot Robinson and Leonard Levine were senior lending officers at Bank Leumi until 1986, and Defendant Eftihia Piper was an officer

of Bank Leumi until 1986. Simon left Bank Leumi in 1986 to create the First New York Bank for Business ("First New York Bank"), which is not a named Defendant. At approximately the same time, Robinson, Levine and Piper also left Bank Leumi and joined First New York Bank. Defendants Vincent Garvey and Rachel Bergsohn were officers at Bank Leumi at all relevant times. The thrust of the complaint is that Defendants, acting as Plaintiffs' bankers, engaged in a series of illegal and fraudulent actions which deprived them of their money and property and ultimately resulted in their financial ruin.

Plaintiffs' tortured relationship with Defendants spans a period of nearly fifteen years and involves a complicated series of transactions. In 1975, Plaintiffs entered into an agreement with American Bank & Trust Company to obtain a $475,000 mortgage loan to purchase a cadillac dealership. The terms of the loan included specified monthly payments, two large lump-sum payments, and a rate of interest at 1.5% above the prime rate. Plaintiffs made regular payments in accordance with the agreement. In 1977, Bank Leumi acquired American Bank and became Plaintiffs' obligee and mortgagee. At that time, a lump sum payment of $125,000, in addition to regular monthly payments, remained due. From 1977 to August of 1979, Bank Leumi made further loans to Center Cadillac and the Officers totaling approximately $750,000 to finance the operations of Center Cadillac, in addition to other unsecured loans to finance Plaintiffs' other business holdings. All of the loans were made pursuant to oral agreements whereby all additional loans would be repaid at the same interest rate that the Officers had agreed to pay American Bank, 1.5% above the prime rate.

In July of 1979, the Officers requested an additional loan of $360,000 for increased business costs. At the request of Robinson, Garvey, Levine and Simon, the Officers prepared and sent to Levine a letter

---

1. Plaintiff Josh Steinhauser brings suit in his capacity as Administrator of the Estate of Marvin Steinhauser.

delineating the nature and purposes of the requested funds. On August 1, 1979, Simon, Robinson, Garvey, and Levine told Plaintiffs that in order to receive the requested funds, they must appear at the offices of Bank Leumi's counsel, Parker Chapin Flattau & Klimpl ("Parker Chapin"), to execute the necessary documents. Plaintiffs appeared at Parker Chapin as requested, expecting to receive the requested $360,000 loan at the same interest rate as the prior loans based on the representations made by Defendants' in July, 1979. Garvey and Levine were present at the Parker Chapin meeting. Much to their surprise, Plaintiffs were told that in order to receive the $360,000, each Plaintiff must execute: (1) certain documents reflecting an agreement for Bank Leumi to tender $1.1 million to Plaintiffs, with no specified repayment or interest terms; (2) certain documents referring to nonexistent agreements for material terms, including repayment and interest provisions; (3) signature pages, unattached to any document, but which affirmed the signor's consent to the terms of the "attached" document; and (4) numerous guarantees making each Plaintiff personally liable for all obligations incurred in the above documents (collectively, the "Documents").

Plaintiffs refused to sign the Documents and demanded the opportunity to have an attorney present. Garvey and Levine refused, ignoring their counsel's advice to let Plaintiffs consult an attorney. Garvey, in the presence of Levine, told Plaintiffs that the Documents were only a formality and that previous oral agreements would still govern the terms of all of the loans. Plaintiffs continued to refuse to execute the documents. Garvey, after speaking to Simon on the phone, then told Plaintiffs that if they did not sign the Documents, Bank Leumi would immediately close all accounts that financed Plaintiffs' business operations. Plaintiffs, fearing that Defendants would act on their threats and force Plaintiffs out of business, signed the documents. Garvey and Levine again reassured Plaintiffs that their previous oral agreements would control.

Immediately after the meeting at Parker Chapin, Garvey suggested to the Officers that they go to a nearby penthouse suite to meet with a Mr. Zohar who might help them reduce their indebtedness to Bank Leumi. The Officers went with Garvey to meet Zohar, who offered $500,000 for one of Plaintiffs' shopping centers which was then valued at $2 million. Plaintiffs refused Zohar's offer. Zohar then offered Plaintiffs a long term usurious loan. The Officers rejected the offer and left the meeting.

Over the next several months, the Officers received by mail various of the Documents with material terms filled in where they had previously been blank, and other documents, not seen before by Plaintiffs, to which Plaintiffs' signatures had been affixed. These documents obligated Plaintiffs to make exorbitant monthly and lump sum payments. Defendants warned Plaintiffs that failure to make the required payments would result in foreclosure on all of Plaintiffs' real estate holdings and refusal to honor any check drawn on any Bank Leumi account. Over the next several years, Plaintiffs were forced to sell many of their assets at below market value, including two shopping centers, two personal homes, and the businesses of Center Leasing and Center Cadillac in order to comply with Defendants' demands.

On three known occasions during 1979 and 1980, Defendants debited a total amount of over $29,000 from Center Cadillac's account. Defendants did not obtain Plaintiffs' consent for these debits and did not send written statements documenting the debits. The two largest debits were ostensibly for legal services rendered by Parker Chapin on behalf of Defendants, and Defendants refused to give any explanation for the third amount debited. Plaintiffs believe that unauthorized debits may have been made on other occasions as well, but are unable to determine the existence of such debits due to Defendants' refusal to provide Plaintiffs with regular written statements.

Plaintiffs claim that Defendants used their financial leverage to extort money

and property from them on a number of occasions. In 1980, Simon used his influence over Plaintiffs' loan accounts to force Center Cadillac to sell him a car for $2,000 below cost, and without payment for taxes and fees. Also in 1980, James Sandler learned through a friend, who had noticed an advertisement for a yacht for sale, that Defendants had advertised, negotiated, and effected the sale of a yacht owned by Center Cadillac. When the Officers protested, they were forced, under threat of foreclosure, to execute all documents necessary to effectuate the sale. In November of 1980, Plaintiffs liquidated Center Cadillac and sold the company's assets in order to comply with the terms set forth in the Documents.

After Center Cadillac was liquidated, Center Leasing assumed all remaining obligations to Bank Leumi and continued to make regular payments on the loans. In 1982, Plaintiffs were forced to sell Center Leasing and liquidate its assets in order to meet their repayment obligations under the Documents. Simon then demanded that the entire outstanding debt be repaid immediately, and began foreclosure proceedings on the Sandler's personal residence, Plaintiffs' one remaining asset. At Plaintiffs' requests, Simon agreed to accept monthly payments of $3,300 in lieu of foreclosure until the balance of the debt was paid.

During the period of their indebtedness to Bank Leumi, the Officers repeatedly requested written statements documenting how their payments were applied to their debt, the rate of interest charged, and the outstanding balance. Defendants repeatedly refused by telephone to provide such statements. Plaintiffs received statements from Bank Leumi on only four occasions, despite Plaintiffs' continual requests for regular statements. In 1981, Plaintiffs received three computer monthly loan statements for the months of January, May and August. In September of 1983, Plaintiffs received a computer monthly loan statement for the month of September, which Plaintiffs believe to have been sent inadvertently. In July of 1985, James Sandler, believing that the entire indebtedness had been repaid or nearly repaid, demanded a written statement from Bank Leumi. Bergsohn refused the request, and instead gave Sandler a credit administration manual which stated the "designated rate" of interest, and told him to compute the principal-interest allocations himself for the entire period of debt in order to determine the principal outstanding. Sandler made the calculations and showed them to Bergsohn, who said that the figure for the remaining debt was too low. Sandler then received by mail a handwritten statement prepared by Bergsohn which contained a history of Plaintiffs' payments and the interest-principal allocations for Plaintiffs' five year indebtedness to Bank Leumi. This document reflected a rate of interest significantly higher than the rate Defendants had agreed to charge. In December of 1989, Michael Steinhauser telephoned Bergsohn and demanded a written statement of indebtedness to comply with requests from the Internal Revenue Service. Bergsohn initially refused, and acceded to the request only when Steinhauser told her that the IRS would question Bank Leumi directly if the statements were not provided. Bergsohn then sent Steinhauser a handwritten statement listing all payments and principal-interest allocations for the ten year period of Plaintiffs' indebtedness to the Bank.

Plaintiffs identify a number of inconsistencies in the statements received. First, the January 1981 statement indicated a payment that reduced interest by nearly $10,000, whereas the handwritten statements reflected no such payment whatsoever. Second, the September 1983 statement reflected a significantly lower outstanding balance than indicated by the handwritten statements for that period, and the September statement indicated that a particular payment had reduced principal, whereas the handwritten statements indicated that the same payment had reduced interest. Third, the 1985 handwritten statement did not specify how the interest rate was computed, whereas the portion of the 1989 handwritten statement that covered the pre–July 1985 period of indebtedness—a mere photocopy of the 1985 handwritten

statement—now showed a rate of interest at "P plus 2" for the pre–July 1985 period.

Plaintiffs allege that Defendants misrepresented the meaning of the term "Prime Rate" and induced Plaintiffs to accept loans from Bank Leumi by misrepresenting the rate of interest actually charged. Plaintiffs also allege that Defendants made material misrepresentations as to interest rates to a "presently-undetermined number of other borrowers," although Plaintiffs do not state any factual basis for this allegation.

After Plaintiffs received the 1989 handwritten statements, Plaintiffs determined that they had finally amassed enough capital to pay the funds alleged to be owing and alleviate the threat of foreclosure. Consequently, James Sandler, Michael Steinhauser and Irwin Steinhauser met with Garvey in March of 1990 and informed Garvey that Plaintiffs would no longer continue making payments to Bank Leumi. Garvey acknowledged the protracted history of Plaintiffs' indebtedness and instructed Plaintiffs to cease making payments. Plaintiffs have made no payments to Bank Leumi since March of 1990. Plaintiffs have since received only one letter demanding payment sent by mail from Bergsohn to James and Rosalyn Sandler, notwithstanding the purported balance of $125,000 that remains due as of March, 1990.

DISCUSSION

I. Choice of Law

█ Before turning to the merits of Defendants' motion to dismiss, the Court must first determine what effect the transfer of venue has on the federal law governing Plaintiffs' RICO claims. The parties relied primarily on Third Circuit law in briefing the motion to dismiss while the case was pending in District Court in New Jersey. After the case was transferred to this Court, Defendants submitted a letter arguing that Second Circuit law is now dispositive and requesting leave to file a brief memorandum of law summarizing the relevant Second Circuit RICO precedents. By order dated December 20, 1991, the Court reserved decision on the disputed question of which circuit's law applies and directed the parties to submit legal memoranda briefing the choice of law issue and the pertinent Second Circuit decisions that would affect Plaintiff's RICO claims.

The decisions of the Second Circuit do not unambiguously answer the question of which circuit's interpretation of federal law is binding. *H.L. Green Co. v. MacMahon*, 312 F.2d 650, 652 (2d Cir.1962), *cert. denied*, 372 U.S. 928, 83 S.Ct. 876, 9 L.Ed.2d 736 (1963), held that a plaintiff may not avoid transfer under 28 U.S.C. § 1404(a) on the grounds that the transferee court will apply a less favorable interpretation of federal law. The court stated:

"if there is a conflict of views among circuits, 'this presents a matter for consideration by the Supreme Court on application for certiorari, not for consideration by a district judge on application for transfer ... We have no sympathy with shopping around for forums.'" *Id.* (quoting *Clayton v. Warlick*, 232 F.2d 699, 706 (4th Cir.1956)).

The court rejected the argument that a plaintiff's initial right to choose a forum includes the right to choose a particular interpretation of federal law. However, the court accepted the view that a plaintiff may choose which state's law governs a state law claim by choosing the initial forum. The court held that when a case is transferred under § 1404(a) the transferee court must apply the state law that the transferor court would have applied. The court justified this distinction between state and federal law based on the nature of our federal system. The court reasoned that a certain amount of forum shopping for state law is inevitable because federal courts adjudicating state law claims apply the laws of fifty separate jurisdictions, while forum shopping for federal law is improper because "[t]he federal courts comprise a single system applying a single body of law, and no litigant has a right to have the interpretation of one federal court rather than that of another determine his case." *Id.*

Similarly, in *Ackert v. Bryan*, 299 F.2d 65 (2d Cir.1962), the court upheld a § 1404(a) transfer despite the fact that the

plaintiff's federal claim would not be viable under the law of the transferor circuit. The court ruled that any prejudice to the plaintiff resulting from the application of the law of the transferor court was not a genuine concern because forum shopping for favorable federal law is not permissible. *Id.* at 70; *see also Scheinbart v. Certain-Teed Products Corp.*, 367 F.Supp. 707, 710–11 (S.D.N.Y.1973) (rejecting as mere forum shopping the plaintiff's argument that she should not be required to litigate her federal claim under the less favorable law of the transferee court).

The ambiguity surrounding the issue of which federal court's interpretation of federal law applies after transfer arises from a later Second Circuit case, *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402 (2d Cir.1975). *Berry* involved an action for violation of federal securities law that had been transferred from the Northern District of Texas to the Southern District of New York. The court dismissed the action as time barred, applying the Texas limitations period that would apply to the Texas cause of action that the court found to be most analogous to the federal action. On appeal, the Second Circuit had to decide which Texas action most closely resembled the federal action for purposes of selecting the appropriate limitations period. In comparing the relevant Texas actions with the Fifth Circuit's interpretations of SEC Rule 10b–5, the court mentioned in a footnote that, "[s]ince this case was brought in a district court in the Fifth Circuit, the substantive law of that circuit is the law we must consider here." *Id.* at 408 n. 7. No substantive analysis followed or preceded this conclusion, and the court did not acknowledge its contrary analysis in *H.L. Green* or *Ackert*. Instead, the court merely cited the case of *In re Plumbing Fixtures Litigation*, 342 F.Supp. 756 (Jud.Pan. Mult.Lit.1972), which relied on *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), to support its statement that Fifth Circuit law applied.

*Berry Petroleum's* reliance on *In re Plumbing Fixtures* and *Van Dusen* is not persuasive. *In re Plumbing Fixtures* stated that a transferee court applies the substantive law of the transferor forum to decide a disputed issue of federal law. The opinion did not contain any analysis justifying this result, but simply cited *Van Dusen*. However, *Van Dusen* held only that a transferee court must apply the substantive state law of the transferor court after a case is transferred under 28 U.S.C. § 1404(a). The Court did not discuss the effect of transfer on the application of federal law. Moreover, the principles underlying the *Van Dusen* holding—to uphold the policies of *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and to preserve the plaintiff's venue privilege to shop for favorable state law—are inapplicable in the federal law context. *See* Marcus, "Conflicts Among Circuits and Transfers Within the Federal Judicial System," 93 Yale L.J. 677 (1984). The Third Circuit has criticized the assumption by the courts in *Berry Petroleum* and *In re Plumbing Fixtures* that *Van Dusen* applies to federal law questions, stating "[i]t is difficult to understand why this should be so since *Van Dusen v. Barrack* involved conflicting *state* wrongful death policies, while in theory, at least, federal law, in its area of competence, is assumed to be nationally uniform, whether or not it is in fact." *In re Pittsburgh & L.E.R. Co. Secur. & Antitrust Litigation*, 543 F.2d 1058, 1065 n. 19 (3d Cir.1976); *see also In re Korean Air Lines Disaster*, 829 F.2d 1171, 1177 n. 2 (D.C.Cir.1987) (Ginsburg, J., concurring) (criticizing *Berry Petroleum* and other cases applying *Van Dusen* to questions of federal law). Judge Friendly has also interpreted *Van Dusen* as limited to state law. *See* Friendly, "The 'Law of the Circuit' and All That," 46 St. John's L.Rev. 406, 412 (1972).

The Court finds more persuasive those cases which analyze the differences between questions of state and federal law for the purpose of determining the effect of transfer under § 1404(a). The most thorough analysis of a transferee court's choice of federal law is found in *In re Korean Air Lines Disaster*, 829 F.2d 1171, 1175–76 (D.C.Cir.1987). The Judicial Panel on Multi-district Litigation had transferred

these cases to the District Court for the District of Columbia for consolidated pretrial proceedings under 28 U.S.C. § 1407. The District Court applied its own interpretation of federal law to the cases, including those cases transferred from district courts in the Second Circuit which follow a contrary interpretation. The D.C. Circuit held that the district court properly adhered to its own interpretation, since the law of the transferor forum on federal question is not binding on a transferee forum in another circuit. The court held that *Van Dusen* did not apply to questions of federal law because it relied on *Erie* policies that are not relevant to the federal law calculus. *Id.* at 1174–75. Moreover, the court explained, applying *Van Dusen* to federal questions would not produce uniformity of interpretations, but would force a federal court to apply contrary federal precedents to similar cases based on the mere circumstance of where the case was initially filed. *Id.* at 1175. The court found it logically inconsistent to require a federal Judge to apply conflicting interpretations of a supposedly unitary federal law, and instead concluded that federal courts have an obligation to engage in independent analysis, with binding precedent set only by the Supreme Court and the Court of Appeals for that circuit. *Id.* at 1176.

Other courts have also refused to blindly extend *Van Dusen* to federal law questions. In *Roth v. Bank of the Commonwealth*, [1981–1982 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 98,267 at ¶ 91,707, 1981 WL 1671 (W.D.N.Y. August 17, 1981), the court rejected *Berry Petroleum*'s interpretation of *Van Dusen* and applied the law of the transferee forum to the federal law issues in the case. The court held that "[b]ecause the court's statement in *Berry Petroleum* is mere dicta, is contrary to *H.L. Green Company v. McMahon*, ... and has been criticized by the United States Court of Appeals for the Third Circuit as over-extending *Van Dusen v. Barrack*, ... it appears to represent an aberration rather than a true reflection of the Second Circuit's view concerning the applicability of the law of the transferor court." *Id.* Similarly, in *Isaac v. Life Investors*

*Ins. Co.*, 749 F.Supp. 855 (E.D.Tenn.1990), the court concluded that the principles underlying *Van Dusen* do not apply to transferred cases involving federal law claims and held that each circuit must independently analyze federal issues of law.

The Court finds the analysis in *H.L. Green* and *Ackert* to have greater precedential weight than the contradictory footnote in *Berry Petroleum* because *Berry Petroleum* addressed the issue in dicta, with no analysis, and without acknowledging the Second Circuit's prior contrary decisions. Moreover, the weight of well-reasoned authority supports the application of the substantive federal law of the transferee court when an action is transferred under § 1404(a). Federal courts are competent to decide issues of federal law and should not be placed in the awkward position of having to apply the federal law of another circuit when it conflicts with their own circuit's interpretation. The Court will decide the issues raised by Defendant's motion to dismiss in conformity with the law of the Second Circuit.

## II. Statute of Limitations

### A. RICO Claims

■ Defendants argue that Plaintiffs' RICO claims are barred by the statute of limitations. The statute of limitations for a civil action brought under 18 U.S.C. § 1962 is four years. *Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). Under Second Circuit law, a civil RICO action accrues at the time the plaintiff discovered or should have discovered the injury resulting from the RICO violation. *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1102 (2d Cir.1988), *cert. denied, Soifer v. Bankers Trust Co.*, 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989).

Defendants argue that Plaintiffs discovered the alleged injuries in 1979 when they executed the loan documents creating the underlying payment obligations and that Plaintiffs' RICO claims accrued as of that date. Defendants cite *Bankers Trust, supra,* as holding that a civil RICO action to

recover damages for a monetary expense accrues at the time a plaintiff is obligated to pay the expense, not when the payment is actually made. In *Bankers Trust*, the plaintiffs incurred legal fees from having to defend against frivolous litigation brought by the defendants as part of the RICO scheme. The plaintiffs argued that the action accrued when they paid the legal fees that resulted from the defendants' RICO violation, not when the fees were incurred. The court disagreed, citing the lower court's reasoning that plaintiffs should not be able to extend indefinitely the time for filing a lawsuit by choosing to make late payments.

The present case is markedly different from *Bankers Trust*. Unlike the plaintiffs in that case, Plaintiffs here could not toll their claims simply by choosing to forestall payment of their expenses. Plaintiffs' payment obligations arose on a continual basis, and Plaintiffs allege that Defendants violated RICO by repeatedly and arbitrarily altering the terms of payment and the amount owed. Although the underlying loan documents were executed in 1979, Plaintiffs' injuries did not occur until they were forced to make payments to Defendants. Consequently, for purposes of applying the statute of limitations, Plaintiffs were injured every time they sustained a monetary loss resulting from Defendants' fraudulent and extortionate activities. *See Landy v. Mitchell Petroleum Tech. Corp.*, 734 F.Supp. 608 (S.D.N.Y.1990) (holding that in applying the statute of limitations to a civil RICO action, the proper focus is not on the defendants' conduct, but rather on the plaintiffs' knowledge of when they were harmed by the defendants' RICO violations).

Plaintiffs have a cause of action to recover damages for each injury caused by a violation of 18 U.S.C. § 1962, and each

action accrues at the time Plaintiffs discovered or should have discovered the injury claimed. *Bankers Trust*, 859 F.2d at 1102. Plaintiffs therefore may recover damages for all injuries which they discovered or should have discovered within the four years prior to the filing of the complaint, regardless of the dates of the RICO violations causing the injuries. *Id.* at 1103. On a motion to dismiss, where the facts alleged in the complaint indicate that, with reasonable diligence, the plaintiffs should have discovered the alleged fraud prior to the limitations period, the claim is barred. *Griffin v. McNiff*, 744 F.Supp. 1237, 1255 (S.D.N.Y.1990). Those injuries which were or should have been discovered prior to the four year period preceding May 14, 1991, the date the present action was brought, are therefore barred by the statute of limitations.

According to the facts alleged in the complaint, Plaintiffs knew or should have known by May 14, 1987, of all injuries sustained as of that date. The complaint alleges that Plaintiffs knew when they executed the 1979 loan that the documents were "fraudulent," that several months later Plaintiffs received additional fraudulent documents, and that Plaintiffs learned from these documents that the terms of their repayment differed from the terms promised and that the documents made them personally responsible for repayment. Compl. ¶¶ 37, 43, 44. The complaint also indicates that Plaintiffs learned of foreclosures and liquidation of business assets that took place before May 15, 1987, as they occurred. In addition, Plaintiffs knew by 1985 that they were being charged a higher rate of interest than that promised by Defendants. Plaintiffs' Memorandum of Law, at 10. Consequently, all monetary losses sustained before May 14, 1987 are time-barred.[2]

**2.** Plaintiffs' argument that these claims are tolled under a theory of duress is not persuasive. Plaintiffs rely on *Cullen v. Margiotta*, 811 F.2d 698, 722 (2d Cir.), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987), which held that the statute of limitations period for certain RICO claims was tolled under the New York doctrine of tolling by duress. However, *Cullen* was decided prior to *Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), which held that the four year statute of limitations for civil actions under the Clayton Act governs civil RICO actions. Before *Agency Holding*, federal courts deciding the timeliness of a RICO action applied the statute of limita-

However, because a civil RICO action to recover damages for an injury does not exist until that injury has been suffered, Plaintiffs have an action for each injury sustained after May 14, 1987, notwithstanding the fact that Plaintiffs already knew of Defendants' fraudulent activity and might have anticipated further harm. Plaintiffs sustained actionable injury every time they lost money as a result of Defendants' RICO scheme. The Complaint alleges that Plaintiffs have made thirty-six payments to Defendants within four years of commencing this lawsuit. Compl. ¶¶ 55, 67–69. Plaintiffs' RICO claims for these payments are timely.

### B. Pendant State Law Claims

■■■ Plaintiffs allege state law claims of common law fraud and breach of contract. In ruling on state law claims, the transferee court must apply the choice of law principles of the transferor forum. *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). A federal court adjudicating a diversity action or pendant state law claim must apply the conflict of law principles of the forum state. *Rohm and Haas Co. v. Adco Chemical Co.*, 689 F.2d 424, 429 (3d Cir.1982). The Court must therefore apply the conflict of law principles that a New Jersey state court would apply to Plaintiffs' state law claims. A New Jersey court would apply New Jersey's statute of limitations to state law claims, even if the substantive law of another state would govern the merits of the claims, unless New Jersey has no substantial interest in the litigation. *O'Keeffe v. Snyder*, 83 N.J. 478, 416 A.2d 862 (1980); *Heavner v. Uniroyal, Inc.*, 63 N.J. 130, 305 A.2d 412 (1973). New Jersey has a substantial interest in the litigation where the plaintiff is a New Jersey domiciliary. *Warner v. Auberge Gray Rocks Inn, LTEE*, 827 F.2d 938, 941 (3d Cir.1987). Because three Plaintiffs are New Jersey domiciliar-

ies, New Jersey's statute of limitations applies to Plaintiffs' state law claims.

■■■ New Jersey's statute of limitations for common-law fraud is six years. N.J.S.A. 2A:14–1. The limitations period for fraud begins to run when the fraud is discovered or could have been discovered through reasonable diligence. *Dreier Co. v. Unitronix Corp.*, 218 N.J.Super. 260, 527 A.2d 875 (1986). Under New Jersey's discovery rule, the statute of limitations accrues when the plaintiff discovers that the defendant is at fault, not when the plaintiff discovers all of the material facts surrounding the wrongdoing. *Hauptmann v. Wilentz*, 570 F.Supp. 351 (D.N.J. 1983), *aff'd without opinion*, 770 F.2d 1070 (3d Cir.1985).

Accepting the allegations of the complaint as true, Plaintiffs were on inquiry notice of the alleged fraudulent scheme over six years before they filed the present complaint. The complaint alleges that Plaintiffs were astonished by the events at Parker Chapin in 1979, that they recognized at the time that the Zohar meeting was "one of several steps taken by Defendants in furtherance of their conspiratorial objectives", and that over the next few months Plaintiffs received by mail various of the Parker Chapin documents in which the material terms, previously left blank, were now completed, in addition to other documents with Plaintiffs' signatures attached even though Plaintiffs had never before seen such documents, and letters from Defendants demanding "exorbitant" lump-sum payments. Compl. ¶¶ 37, 42, 43. These allegations placed Plaintiffs on notice of Defendants' general fraudulent scheme over ten years before Plaintiffs filed this complaint. That Plaintiffs were unable to discover the exact amount of interest they were being charged on the loans until a later date is immaterial where they were placed on notice of the general fraudulent scheme in 1980.

tions period for the state action that most closely resembled the federal RICO action. Because the *Cullen* court relied on New York law to determine the most appropriate limitations period, the court also had to apply the state's rules

as to the tolling of the statute. *Cullen*, 811 F.2d 698, 719 (2d Cir.1987). After *Agency Holding*, state tolling principles no longer govern civil RICO actions.

Plaintiffs argue that the statute of limitations is tolled by the doctrine of fraudulent concealment. To establish fraudulent concealment, a plaintiff must show that the defendant concealed the basic facts disclosing the existence of the cause of action and that the plaintiff did not discover these facts through any fault of her own. *Foodtown v. Sigma Marketing Systems, Inc.,* 518 F.Supp. 485 (D.N.J. 1980). A defendant's mere failure to disclose the existence of a cause of action does not constitute fraudulent concealment. *Hauptmann v. Wilentz,* 570 F.Supp. 351 (D.N.J.1983), *aff'd without opinion,* 770 F.2d 1070 (3d Cir.1985). Plaintiffs' allegations that Defendant repeatedly refused to provide Plaintiffs with bank statements disclosing the amount of interest charged fails to allege fraudulent concealment. Moreover, such refusals should have further caused Plaintiffs to suspect fraud. Even if fraudulent concealment were properly alleged, this doctrine only tolls the limitations period until the plaintiff discovers facts that would reasonably place her on notice of a general fraudulent scheme, regardless of whether she is aware of the full extent of the scheme or all of the details necessary to establish its existence. *Id.* at 398–99. For the reasons discussed above, Plaintiffs were aware of the general fraudulent scheme more than six years before the date the complaint was filed. Plaintiffs' common law fraud claim is therefore dismissed under New Jersey's six year statute of limitations.

The New Jersey statute of limitations for breach of contract actions is also six years. *Taylor v. Ford Motor Co.,* 703 F.2d 738, 742 (3d Cir.1983). A breach of contract claim accrues at the time the breach occurs. *Allstate Insurance Co. v. Altman,* 200 N.J.Super. 269, 491 A.2d 59 (1984). Plaintiffs argue that the breach of contract claim is nonetheless timely under the doctrine of fraudulent concealment. For the reasons discussed above, this doctrine does not make the breach of contract action timely. Plaintiffs' breach of contract claim is also dismissed under the statute of limitations.

## III. Failure to State a RICO Claim Under F.R.C.P. 12(b)(6)

### A. Predicate Acts

18 U.S.C. § 1962(c) prohibits any person employed by or associated with an enterprise from conducting or participating in the conduct of that enterprise's affairs through a pattern of racketeering activity. In order to establish a pattern of racketeering activity, Plaintiffs must show that Defendants committed at least two predicate acts that are among the offenses specifically enumerated in 18 U.S.C. § 1961(5). Plaintiffs allege predicate acts of mail and wire fraud under 18 U.S.C. §§ 1341, 1343, extortion and extortionate credit transactions under 18 U.S.C. § 1951 and 18 U.S.C. §§ 892, 894, and various state extortion laws, and Travel Act violations under 18 U.S.C. § 1952.

#### 1. Mail and Wire Fraud

The elements of mail fraud are: (1) the existence of a scheme to defraud; and (2) the knowing use of interstate mails or transmission facilities in furtherance of the fraud. *See United States v. Gelb,* 700 F.2d 875, 879 (2d Cir.), *cert. denied,* 464 U.S. 853, 104 S.Ct. 167, 78 L.Ed.2d 152 (1983); *United States v. Corey,* 566 F.2d 429, 430 n. 2 (2d Cir.1977); *United States v. Paccione,* 749 F.Supp. 478, 485 (S.D.N.Y. 1990). Each separate mailing can constitute an offense under the mail fraud statute, even if there is only one scheme to defraud. *Connors v. Lexington Ins. Co.,* 666 F.Supp. 434, 451 n. 12 (E.D.N.Y.1987). Wire fraud requires the additional element of a communication crossing state lines. *Wall Street Assocs., L.P. v. Becker Paribas Inc.,* No. 85 Civ. 4649 (LBS), slip opinion (S.D.N.Y. September 12, 1986); *Utz v. Correa,* 631 F.Supp. 592, 596 (S.D.N.Y. 1986).

The first element of mail fraud, the existence of a scheme to defraud, requires "fraudulent or deceptive means, such as material misrepresentation or concealment." *In re Gas Reclamation, Inc. Secur. Litigation,* 659 F.Supp. 493, 512 (S.D.N.Y.1987). Plaintiffs have alleged a

scheme by Defendants to obtain money from Plaintiffs through a course of conduct involving a series of misrepresentations and omissions. The Complaint alleges misrepresentations and omissions as to: the meaning of the term "prime rate"; the rate of interest Plaintiffs would be charged on all loans; the material terms governing repayment of the additional loans; and the amount of total debt to be repaid. The alleged scheme was not limited to the inducement of Plaintiffs to incur the 1979 loan obligations, but included the refusal to disclose the amount owed and the operative repayment terms, and the use of higher interest rates than the rate promised. These allegations sufficiently establish the existence of an underlying scheme to defraud.

To satisfy the second element of mail fraud, the use of the mails in furtherance of a scheme to defraud, the mailings need not be an essential part of the fraudulent scheme as long as they are incidental to an essential part of the scheme. *Schmuck v. U.S.*, 489 U.S. 705, 710–11, 109 S.Ct. 1443, 1444, 103 L.Ed.2d 734, *reh. denied*, 490 U.S. 1076, 109 S.Ct. 2091, 104 L.Ed.2d 654 (1989). The mailings themselves need not contain misrepresentations, nor must they contribute directly to the deception of the plaintiffs. *Id.* at 744, 109 S.Ct. at 1444; *In re Gas*, 659 F.Supp. at 513. Even mailings which are "innocent" or routine when viewed in isolation, may still satisfy the mailing element under the mail fraud statute where the mailing is part of the execution of the scheme as conceived by the perpetrators at the time. *Schmuck*, 489 U.S. at 744, 109 S.Ct. at 1444. Plaintiffs are not required to demonstrate that Defendants personally mailed the documents; it is enough to show that Defendants caused the mailing to occur, or that the use of the mails was foreseeable, even if not actually intended. *United States v. Bortnovsky*, 879 F.2d 30, 36 (2d

Cir.1989); *United States v. Carpenter*, 791 F.2d 1024, 1035 (2d Cir.1986). Under these standards, the alleged mailings were in furtherance of Defendants' scheme to defraud. The 1979 documents clearly furthered the alleged fraudulent scheme, and the bank statements and letters demanding payment were at least incidental to an essential part of the scheme. Moreover, Plaintiffs allege that some of the mailings actually misrepresented the rate of interest actually charged, which presumably induced Plaintiffs to continue making payments. Compl. ¶¶ 57(c), (d), 59, 62, 63. The Court finds that the alleged actions satisfy both elements of mail fraud.[3]

RICO claims based on mail and wire fraud must be pled with particularity under Rule 9(b) of the Federal Rules of Civil Procedure. *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990); *Kuczynski v. Ragen Corp.*, 732 F.Supp. 378, 383 (S.D.N.Y.1989). Rule 9(b) must be construed in light of Rule 8, which requires a short, plain statement of the facts upon which a claim is based. *Ouaknine v. MacFarlane*, 897 F.2d 75, 79 (2d Cir.1990); *Grunwald v. Bornfreund*, 668 F.Supp. 128 (E.D.N.Y.1987). In ruling on a motion to dismiss under Rule 9(b), "the court must read the complaint generously, and draw all inferences in favor of the pleader." *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989). The court must deny a motion to dismiss under Rule 9(b) as long as some of the allegations of fraud are adequate. *Norstar Bank v. Pepitone*, 742 F.Supp. 1209, 1213 (E.D.N.Y.1990); *Morrow v. Black*, 742 F.Supp. 1199, 1205 n. 16 (E.D.N.Y.1990).

Rule 9(b) is satisfied if the complaint gives enough information to enable defendants to frame a responsive pleading and assures that a sufficient basis exists for the allegations made. *Epstein v. Haas Secur. Corp.*, 731 F.Supp. 1166, 1180 (S.D.N.Y.1990); *Rich–Taubman Assocs. v.*

---

**3.** Given this finding, the Court need not reach the issue of whether the acts alleged also violated the wire fraud statute. However, it is by no means clear that the alleged telephone calls satisfy the interstate requirement, particularly in light of the fact that Plaintiffs are New York residents and Defendants work in a New York office. *Cf. Utz v. Correa*, 631 F.Supp. 592, 596 (S.D.N.Y.1986) (inferring that alleged phone calls between Manhattan residents were intrastate in nature and therefore failed to support a violation of the wire fraud statute).

*Stamford Restaurant Operating Co.,* 587 F.Supp. 875, 880 (S.D.N.Y.1984). Allegations of fraud based on information and belief are insufficient unless they include a statement of facts on which the belief is founded. *Di Vittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1248 (2d Cir.1987); *Luce v. Edelstein,* 802 F.2d 49, 54 n. 1 (2d Cir.1986); *Segal v. Gordon,* 467 F.2d 602, 608 (2d Cir.1972). A claim for mail or wire fraud must specify the content, date, and place of any alleged misrepresentations, and the identity of the persons making them. *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990); *Di Vittorio,* 822 F.2d at 1247; *Kuczynski,* 732 F.Supp. at 383. However, the complaint need not specify the time, place and content of each mail communication where the nature and mechanics of the underlying scheme is sufficiently detailed, and it is enough to plead the general content of the misrepresentation without stating the exact words used. *Landy v. Mitchell Petroleum Technology Corp.,* 734 F.Supp. 608 (S.D.N.Y.1990); *Connors v. Lexington Ins. Co.,* 666 F.Supp. 434 (E.D.N.Y.1987); *Beth Israel Medical Center v. Smith,* 576 F.Supp. 1061 (S.D.N.Y.1983). The complaint here sufficiently indicates the general content of the misrepresentations and the time period in which they were made, and the allegations of communications in furtherance of the scheme sufficiently apprise Defendants of their alleged involvement in the scheme to enable them to formulate a responsive pleading.

 Plaintiffs must also specifically allege the manner in which they relied on the fraud to their detriment. *Morin v. Trupin,* 711 F.Supp. 97, 111 (S.D.N.Y. 1989). Although Plaintiffs correctly state that reliance is not an element of mail or wire fraud, RICO liability based on these predicate acts requires that Plaintiffs suffered injuries resulting from their reliance on the fraud. *Shaw v. Rolex Watch U.S.A., Inc.,* 726 F.Supp. 969 (S.D.N.Y. 1989); *Jennings Co. v. Calgi,* No. 85 Civ. 8787 (CBM), slip opinion (S.D.N.Y. September 22, 1986). Defendants argue that if Plaintiffs signed the allegedly fraudulent documents "for the simple reason that

Bank Leumi had exclusive control over their financial lives, and believed that if they did not sign ... the Defendants would immediately carry out their threats," Compl. ¶ 37(f), then Plaintiffs did not rely on the fraud to their detriment. The Court disagrees. Giving Plaintiffs every possible benefit of the doubt, the complaint may be read to allege that although Plaintiffs signed the documents based on Defendants' threats, they would not have done so if Defendants had not misrepresented the nature of the obligations and the interest rates to be charged, *regardless of the threats.* Moreover, Plaintiffs sufficiently alleged reliance by stating that Defendants' misrepresentations as to the applicable rate of interest induced them to borrow additional funds in the first place. Compl. ¶ 77(b). Plaintiffs also allege harm resulting from Defendants' continual misrepresentations of the interest rates actually charged and Defendants' refusal to provide regular bank statements. Reading the complaint in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have sufficiently alleged reliance on the underlying fraud.

 While the circumstances of fraud must be pled specifically, fraudulent intent may be averred generally, as long as the complaint provides a factual basis that gives rise to a strong inference of intent to defraud, knowledge of the falsity, or a reckless disregard for the truth. *Ouaknine v. MacFarlane,* 897 F.2d 75, 80 (2d Cir.1990); *Cosmas v. Hassett,* 886 F.2d 8, 12–13 (2d Cir.1989); *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). Fraudulent intent is commonly pled by alleging facts showing a motive for committing fraud and a clear opportunity for doing so. *Morrow v. Black,* 742 F.Supp. 1199 (E.D.N.Y.1990); *Connors v. Lexington Ins. Co.,* 666 F.Supp. 434, 451 (E.D.N.Y. 1987) (citing *Beck,* 820 F.2d at 50). Where no motive is apparent, fraudulent intent may be shown by identifying factual circumstances that indicate conscious behavior by the defendant. *Atlantic Gypsum*

*Co. v. Lloyds Int'l Corp.*, 753 F.Supp. 505 (S.D.N.Y.1990). However, where factual allegations of motive are lacking, the burden of pleading circumstantial allegations of conscious misconduct is greater. *Grunwald v. Bornfreund*, 668 F.Supp. 128, 133 (E.D.N.Y.1987).

Plaintiffs are also required under Rule 9(b) to connect the allegations of fraud to each individual defendant. *Luce*, 802 F.2d at 54; *Landy*, 734 F.Supp. at 620. A complaint sounding in fraud may not rely on sweeping references to acts by all or some of the defendants because each named defendant is entitled to be apprised of the facts surrounding the alleged fraud. *Brew v. Philips, Appel & Walden, Inc.*, [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,865 at 90,362 (S.D.N.Y.1981). Plaintiffs must demonstrate that each Defendant had a specific intent to defraud either by devising, participating in, or aiding and abetting the scheme. *Morrow v. Black*, 742 F.Supp. 1199, 1205 (E.D.N.Y. 1990); *Connors v. Lexington Insurance Co.*, 666 F.Supp. 434 (E.D.N.Y.1987). General allegations that the defendants "conspired" in the scheme do not sufficiently attribute responsibility for fraud to each individual defendant. *Morin v. Trupin*, 711 F.Supp. 97, 111 (S.D.N.Y.1989).

Reading the complaint in the light most favorable to Plaintiffs, the allegations as to Bank Leumi, Garvey, Simon and Levine are sufficient. These allegations are distinguishable from the "string citations to business communications on particular dates whose contents seem unremarkable" dismissed by the court in *Atlantic Gypsum Co. v. Lloyds Int'l Corp.*, 753 F.Supp. 505, 512 (S.D.N.Y.1990). Although the claims with respect to these Defendants are not as precise as they might be, the complaint does allege some rather remarkable conduct on the part of these Defendants. Plaintiffs claim that Garvey and Levine, after consulting with Simon by phone, presented Plaintiffs with incomplete documents and blank signature pages and fraudulently represented that the obligations incurred would be on the same terms as prior loans. Plaintiffs also claim

that they were induced to borrow additional money in the first place based on Bank Leumi's misrepresentations at to the rate of interest that would be charged. Simon allegedly personally benefitted from the scheme by using Plaintiffs' debt obligations to pressure Plaintiffs into selling him a new cadillac below cost. Plaintiffs also allege that Bank Leumi repeatedly refused to provide them with regular statements documenting the nature of their obligations, and as a result, they continued making payments on the fraudulent obligations. Even if Plaintiffs may have difficulty proving these allegations, it would be premature to dismiss these claims at this stage of the proceedings.

The allegations regarding Piper and Robinson, however, are of a different order. As discussed above, Plaintiffs are required to plead facts sufficient to raise a strong inference of fraudulent intent on the part of each defendant. With respect to these two Defendants, the complaint merely alleges that Piper and Robinson each sent Plaintiffs several letters vaguely described as loan requests and demand letters. Compl. ¶ 78. The complaint also alleges that Robinson was one of the four Defendants who told Plaintiffs to appear at the offices of Parker Chapin in order to receive the additional requested financing. Compl. ¶ 34. These facts do not raise any inference, much less a strong inference, that Piper and Robinson knew of the alleged fraudulent scheme, or that they acted with an intent to defraud Plaintiffs. The complaint does not suggest that Piper and Robinson had any motive to participate in such a scheme, and no factual circumstances are pled indicating sufficient activity from which fraudulent intent may be inferred. The most that can be said about these two Defendants is that they communicated with Plaintiffs regarding requests for loans and they sent letters demanding repayment. The allegations against Piper and Robinson are insufficient.

The allegations with respect to Bergsohn present a more troublesome case. Again, reading the complaint in the light most favorable to Plaintiffs, it may be pos-

sible to draw an inference of fraudulent intent from the circumstances surrounding Bergsohn's involvement in the scheme. Bergsohn's repeated refusals to send statements documenting the amounts owed and the interest rate charged indicates an unusual and somewhat suspicious business practice, particularly in light of the fact that banks routinely provide such statements. Moreover, the inconsistencies in the statements actually sent, including the alteration of the figures for the pre–1985 period in the 1989 statement from how they had appeared in the 1985 statement, may indicate that Bergsohn knew that the interest rates on Plaintiffs' loans fluctuated widely. Bergsohn's failure to explain the inconsistencies in the statements, her repeated refusals to provide any statements whatsoever, and her continuing demands for payment notwithstanding these irregularities in accounting may be sufficient to raise an inference of deceptive conduct. On the other hand, there is absolutely no indication that Bergsohn knew that Plaintiffs had ever been induced to obtain the loans by promises of lower interest rates, nor do Plaintiffs allege a motive on the part of Bergsohn for participating in such a scheme. Consequently, any inference of fraudulent intent is not strong enough to satisfy Second Circuit requirements for the predicate acts of mail and wire fraud, and the allegations against Bergsohn must be dismissed as well.

Plaintiffs have sufficiently identified participation in the fraudulent scheme by Defendants Bank Leumi, Garvey, Simon, and Levine. Plaintiffs have failed to attribute specific fraudulent conduct to the remaining Defendants, Robinson, Piper and Bergsohn. Therefore, RICO claims based on predicate acts of mail and wire fraud against Defendants Robinson, Piper and Bergsohn must be dismissed. As is customary after an initial dismissal under Rule 9(b), Plaintiffs are granted leave to replead any fraudulent conduct attributable to these Defendants if further pleading, in good faith, can establish violations of at least two predicates by each Defendant under the standards set forth in this opinion. *See Luce,* 802 F.2d at 56–57.

## 2. Extortion

Plaintiffs claim that Defendants also violated the Hobbs Act, 18 U.S.C. § 1951, by using threats of severe and immediate economic harm to extort money and property from Plaintiffs. The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence or fear, or under color of official right." 18 U.S.C. § 1952(b)(2). Extortion consists of the use of wrongful means to achieve a wrongful objective. *United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973). For a conviction under the Hobbs Act to stand, the statutorily identified means—actual or threatened force, violence or fear—must have been employed to obtain money or property to which the alleged extortionist had no lawful claim. *Enmons,* 410 U.S. at 400, 93 S.Ct. at 1010.

The exploitation of fear of economic loss in order to obtain property to which the defendant is not entitled violates the Hobbs Act. *United States v. Capo,* 791 F.2d 1054, 1062–63 (2d Cir.1986), *vacated, in part, on other grounds,* 817 F.2d 947 (2d Cir.1987) (en banc). The existence of fear of economic loss is determined from the perspective of the victim, not the extortionist. *United States v. Capo,* 817 F.2d 947, 951 (2d Cir.1987). The victim must have a reasonable belief that the alleged extortionist had the power to harm the victim and would exploit that power to the victim's detriment. *Id.*

Plaintiffs allege a reasonable fear that Defendants would follow through on their threats and ruin them financially if they did not execute the 1979 documents. Although the use of economic fear as leverage to drive a hard bargain in an ordinary commercial relationship will not support a RICO claim based on extortion, *O'Malley v. New York City Transit Authority,* 896 F.2d 704, 709 (2d Cir.1990); *Kovian v. Fulton County National Bank and Trust Co.,* 647 F.Supp. 830, 835 n. 7 (N.D.N.Y. 1986), Defendants' alleged actions constitute more than mere hard bargaining.

Plaintiffs claim that Defendants forced them to sign blank and incomplete documents, which Defendants later altered to reflect greater debt repayment obligations, without permitting Plaintiffs to consult an attorney, and which obligated Plaintiffs to pay more money than they owed and to make all repayments at a higher interest rate than they were obligated to pay.

 The fact that Defendants may have had a legal right to take the actions threatened is immaterial if the object of the threats was to obtain property to which they had no lawful claim. Threats inducing fear of economic loss, although not inherently wrongful, qualify as extortion where such threats are made in pursuit of a wrongful goal. *United States v. Garcia,* 907 F.2d 380, 381 (2d Cir.1990); *United States v. Clemente,* 640 F.2d 1069, 1077–78 (2d Cir.1981), *cert. denied,* 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981); *Viacom Int'l, Inc. v. Icahn,* 747 F.Supp. 205 (S.D.N.Y.1990), *aff'd,* 946 F.2d 998 (2d Cir. 1991). Where the victim of the alleged extortion relinquishes property to the defendant out of fear of economic loss but receives in exchange something which is of no value to the victim, the defendant has no lawful claim to the property received. *Viacom,* 747 F.Supp. at 212. In this case, the complaint does not indicate that Plaintiffs received anything of value as a result of executing the 1979 documents, as Plaintiffs do not allege that they received additional funds when they incurred greater loan obligations. Consequently, Defendants had no lawful claim to obtain more money than Plaintiffs owed before they executed the 1979 documents. Although Defendants may have been entitled to use threats of economic harm to obtain repayment of their existing obligations, they were not entitled to obtain more money than they were due. In addition, Defendant Simon was not entitled to obtain a new cadillac at below cost at Plaintiffs' expense. Compl. ¶ 47(a).

Reading the complaint in the light most favorable to Plaintiffs, the allegation that Defendants threatened Plaintiffs with economic harm in order to obtain property to which they were not entitled sufficiently states a violation of the Hobbs Act. However, as with the mail and wire fraud predicates, there is no indication that Defendants Robinson, Piper and Bergsohn were in any way involved in extortionate conduct, and the allegations against these Defendants must be dismissed.[4]

 Plaintiffs also allege that Defendants violated 18 U.S.C. §§ 892 and 894. A violation of § 892 requires proof that: "(1) an extension of credit was made; (2) it was the understanding of the defendants, as creditors, and the borrower, at the time the extension of credit was made, that delay in making repayment could result in the use of violence or other criminal means to cause harm to the person, reputation or property of some person; and (3) the defendants acted intentionally and knowingly." *U.S. v. Benedetto,* 558 F.2d 171, 176–77 (3d Cir.1977). A violation of § 894 requires proof of the knowing use of extortionate means to collect, or attempt to collect, extensions of credit. *Id.* at 178. In this case, once the additional repayment obligations were incurred, allegedly through extortion and fraud, the facts simply do not indicate that the means of collecting payment were extortionate. *See Kovian v. Fulton County Nat'l Bank and Trust Co.,* 647 F.Supp. 830, 835 (N.D.N.Y.1986) (dismissing RICO claim based on Extortionate Credit Transactions Act where complaint lacked threat of violent force). The RICO claims based on these predicates are dismissed.

 Plaintiffs also allege extortion under state law, citing New York Penal Law § 135.65, relating to coercion, and § 155.42, relating to larceny by extortion. New York's "coercion" statute, N.Y.P.L. § 135.-65, is not among the state criminal laws specified as providing a basis for RICO liability, and the allegations as to this statute are dismissed. 18 U.S.C. § 1961(1)(A).

---

**4.** With respect to those Defendants against whom the complaint properly alleges mail fraud and extortion, the complaint also adequately pleads violation of the Travel Act, 18 U.S.C. § 1952. *See United States v. Riccardelli,* 794 F.2d 829 (2d Cir.1986).

New York's "larceny by extortion" statute defines extortion similarly to the Hobbs Act. *Printers II, Inc. v. Professionals Pub., Inc.,* 784 F.2d 141 (2d Cir.1986); *Kovian,* 647 F.Supp. at 835 n. 7. For the reasons discussed above, the allegations under N.Y.P.L. § 155.42 are sufficient with respect to Defendants Bank Leumi, Garvey, Simon and Levine, and are dismissed with respect to Defendants Robinson, Piper and Bergsohn.

 Plaintiffs also allege that Defendants have violated New Jersey Code of Criminal Justice, § 2C:20–5, theft by extortion. This statute makes it unlawful to obtain property by threatening to "inflict ... harm which would not substantially benefit the actor but which is calculated to materially harm another person." The complaint does not allege that Defendants' actions did not benefit Bank Leumi. The predicates based on violation of New Jersey extortion law are therefore dismissed.

### B. Pattern Requirement

 A pattern of racketeering requires "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Although at least two acts of racketeering are necessary to constitute a pattern, two acts may not be sufficient. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985). The Supreme Court clarified what elements in addition to two predicate acts are necessary to form a pattern in *H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The Court held that to establish liability under RICO, the alleged predicate acts must have a sufficient degree of relatedness and continuity. *Id.* at 239, 109 S.Ct. at 2900.

 Predicate acts are related if they have the same or similar purposes, results, participants, victims, methods of commission, or are otherwise interrelated. *Id.* at 240, 109 S.Ct. at 2901. Continuity is a more elusive concept. The Court described continuity as "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. at 2902. Continuity exists where the predicate acts constitute or threaten continued criminal activity. *Id.* at 240, 109 S.Ct. at 2901. The Court listed several examples of proof that would establish a threat of continued racketeering: (1) that the predicate acts inherently involve a distinct threat of long-term criminal activity; (2) that the entity exists for the purpose of engaging in criminal activity; and (3) that the predicate acts are a regular way of conducting an ongoing legitimate business. Where the criminal scheme is not open-ended and has reached its fruition, continuity may be shown by proving that a series of related predicate acts extended over a substantial period of time. *Id.* at 242, 109 S.Ct. at 2902. A few weeks or months does not qualify as a substantial period of time. *Id.* However, proof of multiple criminal schemes is not necessary to show a pattern. *Id.*

The Second Circuit has also clarified the continuity requirement in two en banc decisions decided shortly before the Supreme Court's *H.J.* decision, *United States v. Indelicato,* 865 F.2d 1370 (2d Cir.1989), and *Beauford v. Helmsley,* 865 F.2d 1386 (2d Cir.1989). These cases shifted the elements of relatedness and continuity from the "enterprise" analysis to the "pattern" requirement, and held that predicate activity must be more than isolated and sporadic to form a pattern. Under these precedents, a RICO pattern does not require proof of multiple schemes, and acts not widely separated in time or space may nevertheless count as separate acts of racketeering. The Second Circuit acknowledged that its analysis "will open the door to far more civil RICO cases than have heretofore survived our scrutiny," but concluded that such a liberal approach is required by the RICO statute. *Beauford,* 865 F.2d at 1393.

 Defendants' alleged acts of mail fraud and extortion are clearly related, as

they involve the same victims and scheme. The question of whether these predicate acts have the requisite continuity merits closer scrutiny. The complaint fails to establish the existence of a threat that Defendants' racketeering will continue in the future. The alleged predicate acts do not inherently require further criminal activity, and the complaint does not raise an inference that the prohibited conduct is a method of doing business regularly employed by Defendants. The Court does not credit Plaintiffs' bare allegation that Defendants engaged in similar fraudulent conduct with respect to other borrowers because Plaintiffs fail to state a factual basis for this belief as required by Rule 9(b) of the Federal Rules of Civil Procedure. Plaintiffs' suggestion that Defendants could continue to employ fraud and extortion to collect the remaining unpaid balance is also insufficient to establish a threat of continuity, as it is wholly speculative and appears unlikely in light of Plaintiffs' allegation that Garvey instructed Plaintiffs to stop making payments.

The Court must therefore evaluate continuity based on the predicate acts alleged to have already occurred. A plaintiff can establish continuity notwithstanding the absence of a threat of continuing criminal conduct by pleading a basis from which to infer that the alleged racketeering activity was neither isolated nor sporadic. *Procter & Gamble Co. v. Big Apple Industrial Bldgs., Inc.*, 879 F.2d 10, 18 (2d Cir.1989), *cert. denied*, 493 U.S. 1022, 110 S.Ct. 723, 107 L.Ed.2d 743 (1990); *Beauford*, 865 F.2d at 1391. Reading the complaint in the light most favorable to Plaintiffs, the alleged predicate activity spanned a period of over ten years, beginning with the execution of the 1979 documents and continuing with the repeated misrepresentations of Plaintiffs' loan obligations in subsequent bank statements. Moreover, Simon's alleged extortion in 1980, and Bank Leumi's repeated unlawful debits in 1979 and 1980, support an inference of continuing deceptive conduct.[5] Although Plaintiffs' allegations

might not have withstood scrutiny at an earlier time in the RICO jurisprudence that binds this Court, the broad reading afforded the pattern requirement in recent decisions supports an inference that the alleged acts were sufficiently continuous to constitute a pattern. *See, e.g., Beauford*, 865 F.2d at 1392 (allegations of one fraudulent mailing to over 8,000 intended victims, and subsequent amended mailings, sufficient to plead a pattern); *Kuczynski v. Ragen Corp.*, 732 F.Supp. 378, 386 (S.D.N.Y.1989) (misrepresentations and omissions over a period of six years in furtherance of a single fraudulent scheme established continuity); *cf. North Star Contracting Corp. v. Long Island R.R. Co.*, 723 F.Supp. 902, 907 (E.D.N.Y.1989) (finding six separate mailings in furtherance of one fraudulent scheme sufficient to form a pattern, and noting that "[a]lthough this Court would once have described the present dispute as an ordinary construction dispute, the broad interpretation afforded RICO by higher Courts binds this Court"). Whether Defendants' actions in fact satisfy the continuity requirement will be the subject of later proof, but the Court is not inclined to dismiss the complaint at this stage of the proceedings for failure to plead a pattern of racketeering.

## C. Enterprise Requirement

An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Plaintiffs allege two alternative enterprises: (1) an "association-in-fact" between Bank Leumi, the individual defendants, and Mr. Zohar; and (2) Bank Leumi Le-Israel, a corporation alleged to be the direct or indirect parent company of Bank Leumi.

A group of persons associated together for a common purpose of engaging in a course of conduct may constitute an association-in-fact enterprise, even though

---

**5.** The Court does not credit the 1979 meeting with Zohar as part of the pattern of racketeering activity because, as Defendants point out, there is no allegation that Zohar engaged in any predicate racketeering act.

they are not a legal entity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). In order to establish an association-in-fact, a plaintiff must show that the members of the enterprise function as a continuing unit. *Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 15 (2d Cir.1989) (citing *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981)). The enterprise must also be an entity separate and apart from the pattern of activity in which it engages. *Perez–Rubio v. Wyckoff*, 718 F.Supp. 217 (S.D.N.Y.1989).

The complaint alleges that Defendants functioned as a continuing unit for the common purpose of perpetrating fraud and extortion on Plaintiffs. Although Simon, Robinson, Levine, and Piper all allegedly left Bank Leumi in 1986, the complaint alleges that they continued to function as a unit with a common purpose after joining New York Bank. Defendants' disagreement with the veracity of this allegation is an issue properly raised in a motion for summary judgment, not in a motion to dismiss on the pleadings. A court may not dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes*, 416 U.S. 232, 236 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)). Moreover, plaintiffs are not required to plead the existence of the enterprise with particularity, and may allege a short and plain statement of the enterprise under Rule 8 of the Federal Rules of Civil Procedure. *Azurite Corp. v. Amster & Co.*, 730 F.Supp. 571, 577 (S.D.N.Y.1990). The complaint also alleges that the enterprise's activities, including the making of false representations regarding Plaintiffs' loan obligations, the extortionate purchase of a car, and the use of blank and incomplete documents, are sufficiently distinguishable from the regular activities of Bank Leumi to permit the existence of an enterprise. Whether Plaintiffs can establish the existence of facts to support these allegations is an issue for later consideration.

Defendants also challenge the association-in-fact enterprise on the grounds that it is not sufficiently distinct from the Defendants because all of the named Defendants are also allegedly members of the enterprise. It is well-established that the "person" engaging in racketeering activity and the "enterprise" must be separate and distinct entities. *Jacobson v. Cooper*, 882 F.2d 717, 719–20 (2d Cir.1989); *Bennett v. United States Trust Co.*, 770 F.2d 308, 315 (2d Cir.1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986). This "non-identity rule" stems from the statutory language requiring that the liable person be "employed by or associated with any enterprise" which affects interstate commerce, and the principle that one cannot associate with oneself. In recent years, however, the Second Circuit has relaxed the non-identity rule to permit the existence of an enterprise where the overlap between the persons and the enterprise is only partial. *Jacobson*, 882 F.2d at 720; *Cullen v. Margiotta*, 811 F.2d 698, 730 (2d Cir.), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987). The inclusion of Zohar in the alleged enterprise satisfies the non-identity requirement. To the extent that Defendants argue that Zohar was not in fact part of any continuing association, this remains a factual dispute that can not be resolved based solely on the pleadings.

Moreover, an association-in-fact enterprise may still exist even if the pleadings did not include Zohar as a member of the enterprise. A defendant may be both a RICO "person" and a member of the enterprise. *Cullen*, 811 F.2d at 730. The fact that each member of the enterprise is also a defendant does not preclude the existence of a valid enterprise. *United States v. Paccione*, 738 F.Supp. 691, 705 (S.D.N.Y. 1990); *Connors v. Lexington Ins. Co.*, 666 F.Supp. 434, 453 (E.D.N.Y.1987). If Zohar is not considered as part of the alleged enterprise, the association-in-fact would be limited to Bank Leumi and several of its

current and former employees. The law in this Circuit is clear that a corporation may not be both a person and an enterprise. *Official Publications, Inc. v. Kable News Co.*, 884 F.2d 664, 669 (2d Cir.1989). However, the Second Circuit has not specifically ruled on the issue of whether a corporation and its employees may form a RICO enterprise. Three courts in this Circuit have indicated that an enterprise composed of a corporation and one or more of its employees may be valid, *Kuczynski v. Ragen Corp.*, 732 F.Supp. 378 (S.D.N.Y.1989); *Richardson Greenshields Secur., Inc. v. Mui-hin Lau*, 693 F.Supp. 1445, 1449 n. 6 (S.D.N.Y.1988); *Metzner v. D.H. Blair & Co.*, 663 F.Supp. 716, 722 (S.D.N.Y.1987), and one court has squarely held that a corporation and its principal officers can not form an enterprise, *Official Publications, Inc. v. Kable News Co.*, 775 F.Supp. 631 (S.D.N.Y.1991). This Court holds that where the alleged enterprise consists of a corporation and its present and former employees, who allegedly continued their racketeering activity after leaving their employment in the corporation, the pleadings sufficiently allege an enterprise separate and distinct from the RICO persons.

■ Defendants next argue that Bank Leumi must be dismissed as a defendant because a bank is not liable under RICO for the acts of its employees. Although the Second Circuit has not yet ruled on this issue, several district courts in this Circuit have addressed the question of whether to impose respondeat superior liability under RICO. *Metro Furniture Rental, Inc. v. Alessi*, 770 F.Supp. 198, 202 (S.D.N.Y. 1991); *Kahn v. Chase Manhattan Bank N.A.*, 760 F.Supp. 369 (S.D.N.Y.1991); *In re Citisource, Inc. Secur. Litigation*, 694 F.Supp. 1069 (S.D.N.Y.1988); *Banque Worms v. Luis A. Duque Pena E. Hijos, Ltda*, 652 F.Supp. 770 (S.D.N.Y.1986). These courts have generally declined to impose vicarious liability under RICO where to do so would in effect penalize an innocent entity which is itself victimized by its employees' racketeering activity. However, these cases are easily distinguishable from the present allegations. In *Metro Furniture*, the court based its decision on the lack of any allegation that other employees knew of or were involved in the alleged racketeering activity, or that the employer benefitted from or authorized the wrongdoing. Similarly, in *Kahn*, the court refused to hold a bank liable for the actions of an employee who had knowingly accepted fraudulently endorsed checks where there was no allegation that any other bank employee knew of or was involved in the fraudulent activity, or that the bank did or could have benefitted from it. *In re Citisource* involved an attempt to impose vicarious RICO liability on a municipal corporation, and the court reasoned, in part, that because a municipality cannot possess the requisite intent to be liable for committing the predicate acts itself, it therefore should not be liable when those same acts are committed by an employee. Finally, in *Banque Worms*, the court relied on the absence of any allegation that officers or management-level employees knew of or benefitted from the alleged racketeering. Unlike these cases, the present case involves allegations that the employer benefitted from and actively participated in the alleged wrongdoing. Where the employer allegedly benefits from the predicate acts, respondeat superior liability under RICO is appropriate. *Amendolare v. Schenkers International Forwarders, Inc.*, 747 F.Supp. 162, 168–69 (E.D.N.Y.1990); *Connors v. Lexington Ins. Co.*, 666 F.Supp. 434, 453 (E.D.N.Y.1987). Plaintiffs' allegations justify the inclusion of Bank Leumi as a defendant.

■ Plaintiffs allege as an alternative enterprise Bank Leumi Le–Israel B.M. ("Le–Israel"), which is allegedly the direct or indirect parent company of Bank Leumi. Defendants argue that Le–Israel is not a valid enterprise because the individual defendants and Bank Leumi did not participate in the conduct of the affairs of Le–Israel, as required for liability under RICO. The Second Circuit has stated:

> one conducts the activities of an enterprise through a pattern of racketeering when (1) one is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement

in or control over the affairs of the enterprise, or (2) the predicate offenses are related to the activities of that enterprise.

*United States v. Scotto*, 641 F.2d 47, 54 (2d Cir.1980). The predicate acts need not be in furtherance of the affairs of the criminal enterprise to satisfy this requirement. *United States v. Simmons*, 923 F.2d 934, 951 (2d Cir.1991).

The complaint alleges that the individual Defendants' positions as employees of Bank Leumi, which is directly or indirectly owned by Le–Israel, and Bank Leumi's position as a direct or indirect subsidiary of Le–Israel, enabled Defendants to participate in the conduct of the enterprise's affairs. Other courts have found a parent corporation to be a proper enterprise based on allegations that a subsidiary participated in the conduct of the affairs of its parent corporation. *Haroco, Inc. v. American National Bank & Trust Co.*, 747 F.2d 384, 402–403 (7th Cir.1984), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985); *Pappas v. NCNB Nat'l Bank*, 653 F.Supp. 699 (M.D.N.C.1987). The Court finds Plaintiffs' allegations as to the Le–Israel enterprise sufficient.

### D. Conspiracy Requirement

To state a claim under 18 U.S.C. § 1962(d), a plaintiff must allege that each defendant agreed to commit two or more predicate acts. *United States v. Ruggiero*, 726 F.2d 913, 921 (2d Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984); *Reinfeld v. Riklis*, 722 F.Supp. 1077, 1083 (S.D.N.Y.1989). Conclusory allegations that defendants conspired with each other to violate 18 U.S.C. § 1962(c) are insufficient. *Morin v. Trupin*, 711 F.Supp. 97, 110 (S.D.N.Y.1989). Rather, the complaint must "allege facts implying an agreement involving each of the defendants to commit at least two predicate acts." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir.1990).

6. Because all of the allegations against Piper have been dismissed, the Court will not reach the question of whether the Court has personal

Plaintiffs have failed to allege a factual basis for a RICO conspiracy with respect to Defendants Robinson, Piper[6] and Bergsohn for the reasons discussed above. Plaintiffs are granted leave to replead the conspiracy allegations with respect to these three Defendants if they can, in good faith, allege a factual basis for finding that each Defendant personally agreed to commit two or more predicate acts. The conspiracy allegations with respect to the remaining Defendants are sufficient.

### CONCLUSION

Defendants' motion to dismiss Plaintiffs' state law fraud and breach of contract claims is granted. Defendants' motion to dismiss Plaintiffs' claims under 18 U.S.C. §§ 1962(c) and 1962(d) is granted with respect to Defendants Robinson, Piper and Bergsohn. Defendants' motion to dismiss Plaintiffs' RICO claims with respect to the remaining Defendants is denied. Plaintiffs have ten days to amend the complaint to replead RICO allegations with respect to Defendants Robinson, Piper and Bergsohn.

SO ORDERED.

jurisdiction over Piper despite service of process at Piper's former residence.