**CENTER CADILLAC, INC., Center Cadillac Leasing, Inc., Irwin Steinhauser, Elaine Steinhauser, Michael Steinhauser, Marleen Steinhauser, Marilyn Steinhauser, Josh Steinhauser as Administrator of the estate of Marvin Steinhauser, James Sandler, and Rosalyn Sandler, Plaintiffs,**

v.

**BANK LEUMI TRUST COMPANY OF NEW YORK, Martin A. Simon, Eliot Robinson, Leonard Levine, Eftihia Piper, Vincent Garvey and Rachel Bergsohn, Defendants.**

No. 91 CIV 7776 (CBM).

United States District Court, S.D. New York.

July 28, 1994.

---

Gold & Wachtel, Randy Steinhauser, New York City, for plaintiffs.

Parker Chapin Flattau & Klimpl, Stephen Rinehart, New York City, for defendants.

## MEMORANDUM OPINION

MOTLEY, District Judge.

Plaintiffs filed this action in May 1991 against defendant Bank Leumi Trust Company of New York ("Bank Leumi") and defendants Martin A. Simon, Eliot Robinson, Leonard Levine, Eftihia Piper, Vincent Garvey and Rachel Bergsohn alleging violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Section 1961, *et seq.,* in connection with a loan of money to them by Bank Leumi in August 1979. The complaint also asserted claims of common law fraud and breach of contract.

Defendants moved to dismiss the complaint for failure to state a claim or, in the alternative, to transfer venue pursuant to 28 U.S.C. § 1404(a). Judge Nicholas H. Politan, United States District Judge, District of New Jersey, transferred the case to the Southern District of New York by order dated October 28, 1991. By memorandum opinion and order dated April 13, 1992, this court dismissed plaintiffs' fraud and breach of contract claims as barred by the statute of limitations and dismissed the complaint in its entirety with respect to defendants Eliot Robinson, Eftihia Piper and Rachel Bergsohn for failing to state a claim upon which relief may be granted. *See Center Cadillac Inc. v. Bank Leumi Trust Co. of New York,* 808 F.Supp. 213 (S.D.N.Y.1992). With respect to the RICO claim, the court held that

"all monetary losses sustained before May 14, 1987 [were] time-barred" by the statute of limitations. *Id.* at 225. Hence, plaintiffs recovery, if any, was limited to the thirty-six loan payments made within four years of commencing their lawsuit. *Id.*

Defendants have since moved for summary judgment against plaintiffs on their remaining RICO claim. On Tuesday, May 31, 1994, the court heard oral argument on defendants' motion. Based upon the evidence presented by both parties, this court finds that plaintiffs have failed to produce evidence to support the allegations made in their complaint. Accordingly, defendants' motion is granted and they are entitled to judgment for the balance of plaintiffs' indebtedness plus accrued interest and attorneys' fees.

## FACTS

Although this opinion assumes familiarity with the facts set forth in its prior opinion, a brief overview of the facts which pertain to plaintiffs' RICO claim is necessary. Briefly stated, plaintiffs Irwin Steinhauser, Michael Steinhauser and James Sandler (collectively, "the Officers") were officers of Center Cadillac and Center Leasing, two corporations authorized to do business in the state of New York. Plaintiffs Center Cadillac, Center Leasing, the Officers,[1] and the Officers' spouses,[2] brought this suit against Defendants Bank Leumi and certain officers of Bank Leumi. Defendant Martin Simon was chief lending officer of Bank Leumi from 1979 to 1986, at which time he left Bank Leumi to start the First New York Bank for Business ("First New York Bank"). Defendant Eliot Robinson was a senior lending officer at Bank Leumi until 1986 when he also left to join First New York Bank.

In 1975, plaintiffs obtained a $475,000 mortgage loan from American Bank & Trust Company ("ABT" or "ABT Loan") to purchase a Cadillac dealership. The terms of the loan included specified monthly payments and two large lump-sum payments (or "bal-

loon payments") of $175,000 due April 1, 1976 and $125,000 due December 31, 1978. Exhibit C to the Affidavit of Stephen G. Rinehart ("Rinehart Aff."). The loan bore an interest rate of 1.5% above the prime rate and was secured by a second mortgage on plaintiffs' residences; mortgages on their two shopping malls, Marwin Malls and Winmar Malls; a lien on all bank accounts owned by plaintiffs; and all of the assets and inventory of their Cadillac dealership. Plaintiffs additionally executed unconditional guarantees of the debt and assigned to ABT the General Motors "holdback" accounts of Center Cadillac. Rinehart Aff., Ex. A at 44:9–21; 47:5–9; Ex. C; and Ex. D at 2–3.

In 1976, Bank Leumi acquired certain assets of ABT including the ABT Loan which was assigned to the bank. At that time, the $125,000 balloon payment, in addition to regular monthly payments, remained due. In 1977 and 1978, Bank Leumi made two additional loans to plaintiffs totalling $335,000, the proceeds of which plaintiffs used to purchase a yacht and to finance their other business holdings. Rinehart Aff., Exs. F, G, H, I.

Plaintiffs also maintained a separate checking account for Center Cadillac at Bank Leumi, which, taken from the monthly reports that plaintiffs made to General Motors, had an increasingly negative cash balance. By April 1979, Center Cadillac was reporting "cash in bank" of negative $794,728; by May 1979, total cash in bank was negative $976,180; and by the end of July 1979, Center Cadillac's negative cash position totalled $1,205,510. Rinehart Aff., Ex. N. By the first week of August 1979, Center Cadillac's checking account statement reflected an overdraft exceeding $1,100,000. Rinehart Aff., Ex. O. Prior to August 1979, there is no evidence that plaintiffs repaid any portion of Center Cadillac's negative cash balance.

The essential dispute in this matter begins with plaintiffs' request for an additional

---

**1.** Plaintiffs Marvin Steinhauser and James Sandler are deceased. Plaintiff Josh Steinhauser brings suit in his capacity as Administrator of the Estate of Marvin Steinhauser.

**2.** *It is undisputed that plaintiffs Marleen Steinhauser, Marilyn Steinhauser, Elaine Steinhauser and Roslyn Sandler did not take part in any negotiations or discussions with Bank Leumi concerning the loans at issue in this case.*

$360,000 loan to provide working capital for Center Cadillac in July 1979. According to plaintiffs, the Officers prepared and sent to Levine a letter delineating the nature and purposes of the requested funds.[3] On August 1, 1979, Simon, Robinson, Garvey, and Levine allegedly told plaintiffs that in order to receive the requested funds, they were required to appear at the law offices of Bank Leumi's counsel, Parker Chapin, on August 9, 1979.

When they appeared at Parker Chapin's offices on August 9, plaintiffs were met with "a stack of documents piled high on the table they were told to sign." Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 5 ("Pl.'s Memo."). Among the documents which plaintiffs were allegedly forced to execute at that meeting were: (1) "a promissory note, date [sic] August 9, 1979, requiring plaintiffs to pay $1,100,000 on December 31, 1979" (Pl.'s Memo. at 5) ("August 1979 Loan"); (2) "signature pages that were unattached to any document" (*Id.* at 6); and (3) a "Modification, Extension and Spreader Agreement, dated as of December 31, 1978," which modified the repayment terms on the final balloon payment of the ABT Loan. *Id.* Plaintiffs also signed a one-page letter dated August 9, 1979 acknowledging a credit extension of $1,100,000 by Bank Leumi and agreeing to repay that amount "plus interest at the rate of 3% per annum in excess of the prime rate." Rinehart Aff., Ex. R. The letter also promised repayment of $110,416.62 "plus interest at the rate of 3% per annum in excess of the prime rate," which represented the outstanding balance on the ABT Loan. *Id.*

Plaintiffs initially refused to sign the documents without the presence of their attorney, but they later decided to sign them after defendants threatened to immediately close all of Center Cadillac's bank accounts. Pl.'s Memo. at 5. Accordingly, plaintiffs signed the documents because they feared that their business would be ruined.

Defendants warned plaintiffs that failure to make the required payments would result in foreclosure on all of plaintiffs' real estate holdings and refusal to honor any checks drawn on their Bank Leumi account. Since plaintiffs could not repay the loan, over the next several years, they were forced to sell many of their assets which had been used as collateral for the Bank Leumi loans at below market value, including their shopping malls, their personal homes, and their businesses.

In essence, plaintiffs claim that defendants used their financial leverage to extort money and property from them in the course of repaying the August 1979 Loan. Plaintiffs additionally claim that defendants defrauded them into executing the loan by misrepresenting the meaning of the term "prime rate" and misrepresenting the rate of interest actually charged on the 1979 loans. Finally, plaintiffs claim that defendants failed to provide them with loan statements for several years, and the loan statements that were sent contained erroneous information.

Defendants, on the other hand, argue that plaintiffs cannot prove the essential elements of their RICO claim because they have failed to establish that defendant committed the predicate acts alleged in the compliant. According to defendants, there is no evidence that they either defrauded plaintiffs into signing the loan documents, misrepresented the terms of the loans, or used economic fear to extort property from plaintiffs to which they were not legally entitled. As such, "what remains is nothing more than the workout of a troubled commercial loan, embellished with self-serving allegations of 'fraud' and 'extortion' having no support in the record." Defendants Memorandum of Law in Support of Motion for Summary Judgment at 2. ("Def.'s Memo.").

---

**3.** More specifically, plaintiffs claim that they "prepared a letter, and sent it to [defendant Leonard] Levine" formally requesting the $360,-000 loan. Comp. ¶ 33. Despite numerous attempts by defendants to obtain the letter during discovery, plaintiffs failed to produce this evidence until May 12, 1994, almost two years after defendants first requested it in their interrogatories and on the eve of the trial in this matter which was scheduled to begin on June 1, 1994. Thus, by order dated May 23, 1994, the court ordered the letter excluded from the trial because it was not signed and there was no evidence indicating that it had been previously produced to defendants.

Based upon the evidence presented by the parties, the court finds that plaintiffs have failed to establish that defendants' actions to recover the $1,100,000 overdraft in plaintiffs' checking account with Bank Leumi or to recover the remaining balance due on the ABT Loan violated RICO. Accordingly, defendants are entitled to summary judgment in their favor and a judgment against plaintiffs for the balance of their indebtedness plus accrued interest and attorneys' fees.

## DISCUSSION

Title 18 U.S.C. § 1962(c) provides that:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises's affairs through a pattern of racketeering activity or collection of unlawful debt.

■■■ To establish a civil RICO claim, plaintiffs must plead (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346, 358–59 (1985). A pattern of racketeering activity requires the commission within a ten year period of at least two predicate acts that violated laws listed in 18 U.S.C. § 1961(1); these acts must be related and must amount to, or threaten the continued likelihood of, continued criminal activity. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Section 1961(1) defines "racketeering activity" to include, *inter alia*, violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, and extortion in violation of the Hobbs Act, 18 U.S.C. § 1951(a). Based on the evidence presented, plaintiffs have failed to establish the predicate acts of mail fraud [4] or extortion. Accordingly, defendants' motion is granted.

*No Proof of Mail Fraud*

As the court noted in its earlier opinion, in order to prove mail fraud, plaintiffs must prove: (1) the existence of a scheme to defraud; and (2) the knowing use of interstate mails or transmission facilities in furtherance of the fraud. *Center Cadillac*, 808 F.Supp. at 227 (*citing, United States v. Gelb*, 700 F.2d 875, 879 (2d Cir.), *cert. denied*, 464 U.S. 853, 104 S.Ct. 167, 78 L.Ed.2d 152 (1983); *United States v. Corey*, 566 F.2d 429, 430 n. 2 (2d Cir.1977); *United States v. Paccione*, 749 F.Supp. 478, 485 (S.D.N.Y.1990)).

Regarding the first element of mail fraud—the existence of a scheme to defraud—the court found that:

Plaintiffs ... alleged a scheme by [d]efendants to obtain money from [p]laintiffs through a course of conduct involving a series of misrepresentations and omissions ... [regarding] [t]he meaning of the term "prime rate;" the rate of interest [p]laintiffs would be charged on all loans; the material terms governing repayment of the additional loans; and the amount of total debt to be repaid. *Center Cadillac*, 808 F.Supp. at 228.

■■■ While the court found that plaintiffs pleaded those facts necessary to survive a motion to dismiss, it is well established that mere allegations are not enough to survive a motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986). Instead, plaintiffs "must present affirmative evidence ... [e]ven where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Id.* It is undisputed that both parties have taken extensive discovery in this case. However, upon review of the evidence submitted by the parties, the court finds that plaintiffs have failed to establish the evidence necessary to prevail on defendants' motion.

First, there is no evidence that defendants misrepresented the rate of interest that would be charged on plaintiffs' loans. Plain-

---

4. Since plaintiffs have failed to establish the alleged acts of mail fraud, the court need not reach the additional requirement under the wire fraud statute. *United States v. Muni*, 668 F.2d 87, 89 n. 3 (2d Cir.1981) (noting that § 1343 is included within the mail fraud chapter and appears to be patterned after § 1341).

tiffs claim that "[d]efendants [ ] agreed to charge 1½% over the 'prime rate' on the approximately $1,100,000 credit extension to plaintiffs that had no particular due date, yet on or about August 9, 1979, demanded that plaintiffs sign a promissory note for the $1,100,000 at an interest rate of 3% over the 'prime' rate that was due on December 31, 1979...." Pl.'s Memo. at 22. However, plaintiffs have submitted no evidence to substantiate this allegation.

The evidence shows that upon the transfer of their account to Bank Leumi, plaintiffs received two additional loans from Bank Leumi prior to signing the controversial promissory note on August 9, 1979, including:

a. $135,000 promissory note dated January 18, 1977, bearing interest at *three percent (3%) over the prime rate* ("1977 Loan"). Exhibits F & G to the Affidavit of Stephen G. Rinehart ("Rinehart Aff.") The loan was secured by a standard U.S. Maritime Administration Yacht mortgage which permitted Bank Leumi to seize and sell the vessel in the event of a default. *Id.* The loan was also secured by the unlimited personal guarantees of plaintiffs Marvin and Marilyn Steinhauser, James and Roslyn Sandler, Irwin and Elaine Steinhauser, and Michael and Marleen Steinhauser. *Id.* at Ex. H.

b. $200,000 term loan dated March 30, 1978 secured by General Motors Holdback account, bearing interest at 10.25%, an amount representing *two percentage points over the prime rate of 8¼%*. Rinehart Exs. I, J. On October 24, 1978, the loan was renewed at an interest rate of 13¼%, representing *three percent over the prime rate of 10¼%* then in effect. *Id.* at Ex. J. Plaintiffs Marvin and Marilyn Steinhauser, James and Roslyn Sandler, Irwin and Elaine Steinhauser, and Michael and Marleen Steinhauser also served as guarantors for this loan. *Id.*

It is undisputed that the interest rates on both Bank Leumi loans were higher than 1.5% over prime. Also, when Bank Leumi granted plaintiffs' request to extend the due date of their remaining balance on the ABT Loan, the parties executed an Extension Agreement which allowed plaintiffs to repay the balance over thirty six months at an increased interest rate of 3% over the prime rate. Steinhauser Aff., Exs. Q and X. Throughout plaintiffs' entire borrowing history with both Bank Leumi, they have never received a loan at an interest rate 1.5% over prime and have failed to offer credible evidence to support the oral representations allegedly made by Bank Leumi regarding the interest rate to be charged on the August 1979 Loan.[5] Thus, judging by the defendants' lending history regarding plaintiffs, the interest rate charged on the August 1979 Loan appears to be in conformity with rates previously charged to plaintiffs and do not support a finding that defendants fraudulently misrepresented an interest rate in this case.

Second, the court finds the alleged misrepresentations concerning the prime interest rate equally unpersuasive. The term "prime rate" is well recognized in the financial community as a short-term interest rate quoted by a commercial bank as an indication of the rate being charged on loans to its best commercial customers. David L. Scott, *Wall*

---

5. Even plaintiffs' testimony seems contrary to their allegations regarding the interest rate. For example, when questioned on this matter during his deposition, plaintiff Michael Steinhauser replied:

Q. Did either Mr. Sandler, Irwin or Marvin [Steinhauser] tell you after the [August 9 meeting] that they received a document from the bank indicating the interest at the rate of 3% over prime in connection with the million one [loan]?

A. The discussion subsequent to that meeting were [sic] always about the indebtedness and the term. The rate was, our impression it was one and a half, but it was not something we could fight about at that point in time. Our concern was surviving, *so it was not about rate,* it was about term and pay back ability. Rinehart Aff., Ex. A at 153 (emphasis added).

From this testimony, it appears that plaintiffs may have had an "impression" they would be charged an interest rate of 1.5% over prime, but there was no substantive discussion with Bank Leumi on or before August 9 which directly addressed the issue. Moreover, as defendants correctly note, any prior oral understandings which were not contained in the written loan agreements are inadmissible under the parole evidence rule. *Manufacturers Hanover Trust Company v. Margolis,* 496 N.Y.S.2d 36, 37, 115 A.D.2d 406 (1st Dept.1985).

*Street Words* 271 (1988). Plaintiffs allege that defendants made various misrepresentations concerning the prime rate, such as "extending loans to customers at rates well below the amount indicated to be the 'prime rate'." The court previously noted that plaintiffs had no factual support for this claim, *Center Cadillac*, 808 F.Supp. at 222, and that finding was further substantiated during the following colloquy between the court and plaintiffs' counsel at a pre-trial conference:

> THE COURT: Just a moment. There is a question unanswered. That is, what law or banking regulation do you claim Bank Leumi violated when they charged your client a higher [interest] rate than others similarly situated?
>
> [RANDY] STEINHAUSER: The fraud that we are claiming, your Honor, as one of a number of frauds on the loans was that the prime [rate]—it was a misrepresentation.
>
> [Defendants] were claiming that prime was based upon a rate to their best borrower for that type of loan and we are claiming, no, there were borrowers such as loan brokers within the bank that received lower rates on their loans which in effect meant—
>
> THE COURT: Well, in other words, there is no state law that you can point to or banking regulation which requires a bank to give everyone the same basic rate, prime rate that they have determined to be the prime rate among their customers, is that it?
>
> .    .    .    .    .
>
> THE COURT: What was that allegation based on?
>
> .    .    .    .    .
>
> MR. STEINHAUSER: The false prime rate?
>
> THE COURT: You said you claimed in your complaint that Bank Leumi had a false prime rate.
>
> MR STEINHAUSER: Yes.
>
> THE COURT: They were charging your client one rate and somebody else something else, is that it?
>
> MR. STEINHAUSER: Yes, your Honor.
>
> THE COURT: The question is, when you filed the complaint what was that based on?
>
> MR. STEINHAUSER: That was based upon, as the plaintiffs testified during their deposition, that was based upon conversations they had had [sic] with various Bank Leumi employees at the time they indicated that was a possibility.
>
> We did not, in our hands, as far as this particular fraud, have any documents to show that there was another borrower getting a below prime rate. We had it from those conversations and we made that one of the allegations in the complaint.
>
> .    .    .    .    .
>
> THE COURT: Did they have anything in writing which would demonstrate it?
>
> MR. STEINHAUSER: From those employees?
>
> THE COURT: From anybody?
>
> .    .    .    .    .
>
> THE COURT: Well, the long and short of this is that you don't have any witnesses from the bank who spoke to your client and established this fact—
>
> MR. STEINHAUSER: No, we don't.
>
> THE COURT: —Of the prime rate and you don't have any documentary proof of it, is that right?
>
> MR. STEINHAUSER: Not yet, your Honor, no.

Tr., 10–14 (April 26, 1994).

Plaintiffs have simply failed to present any evidence that Bank Leumi charged a "false prime interest rate" or otherwise misrepresented the interest rate to be charged on their loans. Further, even if plaintiffs could prove that defendants charged other customers lower interest rates, such activity would not violate federal law. To the contrary, a decision to charge certain customers lower rates than others—a common occurrence in the banking industry—merely reflects the bank's greater confidence in the financial stability of those customers. Therefore, plaintiff's allegations are without merit and must be denied.

Third, the court finds that the loan documents signed by plaintiffs at the August 1979 meeting were neither ambiguous or misleading. On August 9, 1979, plaintiffs signed a promissory note promising to pay Bank Leumi $1,100,000 plus interest at the rate of prime plus three percentage points on December 31, 1979. Rinehart Aff. Ex. Q. Plaintiffs additionally signed a one-page letter dated August 9, 1979 acknowledging the debt and agreeing to extend the bank's security interest in plaintiffs' yacht (which was currently being used to secure the 1977 Loan).[6] The court finds it incredible that plaintiffs could sign such documents without reading their terms. This court finds it equally unlikely that plaintiffs would have signed the *one page* letter that omitted practically every term of the loans. Therefore, the court finds that the terms of the August 1979 Loan and the modified ABT Loan were patently clear to plaintiffs and the corresponding documents contained no material misrepresentations.

Moreover, at the August meeting, plaintiffs signed a particular document called the "Modification, Extension and Spreader Agreement" which modified the terms of the ABT Loan. Steinhauser Aff., Ex. Q. The modification agreement called for repayment of the remaining balance of $125,000 according to the terms set forth in the Extension Agreement, which was simultaneously executed. *Id.;* Steinhauser Aff., Ex. X; Rinehart Aff., Ex. M. Plaintiff argues that the extension agreement contains several flaws that shed doubt on its authenticity. Steinhauser Aff., Ex. X. The extension agreement was not on the recorded list of loan closing documents (Steinhauser Aff., Ex. R), was not notarized or recorded as other loan documents were and Marleen Steinhauser's signature is allegedly of "dubious authenticity." Pl.'s Memo. at 6.

However, plaintiffs have not identified any statute or caselaw requiring that a loan extension agreement be notarized or recorded in order to be enforceable. Moreover, plaintiffs have failed to submit an affidavit from Marleen Steinhauser affirmatively denying the signature on the extension agreement. Accordingly, plaintiffs' speculation concerning the authenticity of the extension agreement is insufficient to overcome its burden on a summary judgment motion. *Miloslavsky v. AES Engineering Soc., Inc.,* 808 F.Supp. 351, 353 (S.D.N.Y.1992) (citations omitted) (the mere existence of some metaphysical doubt concerning the facts will not suffice to defeat a summary judgment motion, nor will speculation or conjecture as to the nature of the facts).

In summary, plaintiffs have failed to prove that defendants engaged in a scheme to fraudulently induce them to execute the August 1979 loan documents. Consequently, it is unnecessary to discuss the remaining elements of the federal mail fraud statute and plaintiffs' claim on this ground is denied.

### No Proof of Extortion

Defendants also move for an order of summary judgment on plaintiffs' federal extortion claim. The court found in its previous opinion that plaintiffs had sufficiently pleaded their claim by alleging that: "[d]efendants forced them to sign blank and incomplete documents, which [d]efendants later altered to reflect greater debt repayment obligations, without permitting [p]laintiffs to consult an attorney, and which obligated [p]lain-

---

6. More specifically, the letter was addressed to Bank Leumi and signed by Irwin Steinhauser and Michael Steinhauser in their respective capacities as president and secretary of Center Cadillac. Rinehart Aff., Ex. R. The letter went on to state:

In consideration of your extension to us of certain additional credit in the amount of $1,100,000, we hereby agree that the mortgage ("Mortgage") previously taken by you on our vessel the Caddy V, Official No. 533791, to secure our obligation to you [on the 1977 Loan], is hereby extended to secure the following additional obligations to you:

1. The sum of $1,100,000, plus interest at the rate of 3% per annum in excess of the prime rate, upon a promissory note dated August 9, 1979 issued by us to you.

2. The amount of $110,416.62, plus interest at the rate of 3% per annum in excess of the prime rate, upon a promissory note dated December 29, 1975 (as modified under an Extension Agreement dated December 31, 1978) issued by Irwin and Elaine Steinhauser, Marvin and Marilyn Steinhauser, Michael and Marleen Steinhauser, and James and Rosalyn Sandler to you and guaranteed by us by a guaranty dated December 29, 1975. *Id.*

tiffs to pay more money than they owed and to make all repayments at a higher interest rate than they were obligated to pay." *Center Cadillac,* 808 F.Supp. at 232.

■ A violation of the Hobbs Act involves two elements: obstruction of interstate commerce and robbery or extortion. 18 U.S.C. § 1951(a). The Hobbs Act defines extortion as the "obtaining of property from another, with his consent, induced by the wrongful use of actual or threatened force, violence or fear, or under color of official right." *Id.* As this court previously held, in order to prevail on its extortion claim, plaintiffs must prove that defendants used "actual or threatened force, violence or fear ... to obtain money or property to which [they] had no lawful claim." *Center Cadillac,* 808 F.Supp. at 231.

■ Plaintiffs' extortion claim is best summarized by their own statement: "Defendants had no right to collect $1,100,000 by December 31, 1979 at an interest rate of prime plus 3%." Pl.'s Memo. at 20. The evidence establishes otherwise. As illustrated by the monthly financial statements prepared by plaintiffs for General Motors, the cash balance in plaintiffs' checking account became increasingly negative between January 1, 1979 and August 31, 1979. Rinehart Aff., Ex. N. As of August 31, 1979, plaintiffs had a negative cash balance of $1,205,510.37 which represented a series of checks presented to Bank Leumi for payment and credit extensions which were fully honored by the bank despite the fact that plaintiffs had made no deposits to cover the drafts. *Id.*

It is well established that a bank has a legitimate right to recover any overdrafts against the customer. As the court aptly stated in *Title Guarantee & Trust Co. v. Emadee Realty Corporation,* 136 Misc. 328, 328–29, 240 N.Y.S. 36, 37 (1930):

> Without question, as between a banking firm and a depositor not a member of the firm, an overdraft is a loan. The payment

of the latter's check when no funds stand to his credit is an advance by the firm of its own money, for the repayment of which, with lawful interest, the customer is liable. It is payable absolutely and in full, without abatement or contingency, and so constitutes a loan in all its characteristics.

*See also, Withers v. Jefferson Trust Co.,* 123 N.J.Eq. 113, 196 A. 442 (1938) ("[t]he payment of an overdraft by a bank amounts to a loan to its depositor, which is recoverable in the absence of an equitable defense"). Established precedent suggests that defendants had a legal right to treat plaintiffs' overdraft as a loan and impose terms and conditions upon its repayment, including charging them a reasonable interest rate.[7]

Plaintiffs allege that defendants violated the Hobbs Act by using threats of severe and immediate economic harm to extort money to which they were not entitled, but the evidence does not support their contentions. Instead, plaintiffs owed Bank Leumi a very large sum of money which, judging by the economic climate during the period in which the acts complained of occurred, they could not repay without liquidating the collateral that they had previously pledged. However, just because plaintiffs found themselves in such harsh circumstances does not mean the court should automatically view them as victims of extortion. To the contrary, "the use of economic fear as leverage to drive a hard bargain in an ordinary commercial relationship will not support a RICO claim based on extortion." *Center Cadillac,* 808 F.Supp. at 231; *see also, U.S. v. Kattar,* 840 F.2d 118, 123 (1st Cir.1988) ("A threat of economic harm ... is not 'per se' wrongful; a legal right to the funds or property at issue may therefore justify the threat of pecuniary harm, depending on the sort of harm threatened."). After reviewing the entire record in this case, the court finds that defendants' actions were entirely reasonable considering the amount of indebtedness that plaintiffs

7. While it is undisputed that plaintiffs incurred the overdraft, plaintiffs argue that defendants had no legal right to convert it into a promissory note and impose terms for its repayment. Instead, defendants "could only commence litigation to recover on an overdraft and the bank could not recover interest." Pl.'s Memo. at 20.

As the court could not find any precedent to support this allegation and plaintiffs have failed to direct the court to any relevant authority other than a so-called "admission" by defendant Martin Simon, this argument is without merit and is disregarded for purposes of this opinion.

had amassed and the length of time such indebtedness had gone unpaid. Thus, plaintiffs have failed to create a genuine issue of material fact as to which a reasonable jury could find in their favor that defendants violated the Hobbs Act.

In considering a summary judgment motion, the court is bound to view the evidence in the light most favorable to the plaintiff. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513, 91 L.Ed.2d at 216. However, the judge must also "view the evidence presented through the prism of the substantive evidentiary burden" upon which the nonmoving party's claim is based. *Id.* It is clear from the evidence presented that plaintiffs cannot prove the essential elements necessary for a reasonable jury to find mail fraud or extortion in this matter.

### CONCLUSION

For the foregoing reasons, the court grants defendants' motion. Defendants are entitled to recover the outstanding indebtedness on plaintiffs' loans together with the designated interest on the loan agreements and reasonable attorneys' fees incurred in litigating this matter.

Defendants must submit an affidavit to this court detailing their fees and related expenses within thirty days of the effective date of the accompanying order. Plaintiffs will have fifteen days from such date to file papers in opposition to defendants' affidavit.